ALMA M. HALLIGAN, APPELLANT, v. WALTER T. COTTON, APPELLEE.

227 N. W. 2d 10

Filed March 20, 1975. No. 39626.

Martin A. Cannon of Matthews, Kelley, Cannon & Carpenter, for appellant.

David A. Johnson, Ronald H. Stave, and Emil F. Sodoro, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, MC-COWN, NEWTON, CLINTON, and BRODKEY, JJ.

CLINTON, J.

This is an action for medical malpractice against the defendant doctor. After the plaintiff rested her case-

in-chief, the defendant moved for a directed verdict which the trial judge granted. Plaintiff appeals. We affirm.

The specific issue on appeal is whether, considering the facts shown by the evidence and the reasonable inferences which might be drawn therefrom, it was nonetheless necessary for the plaintiff to have presented expert testimony to prove that a hole in the plaintiff's bladder, described as a vesical-vaginal fistula, which arose as a consequence of an abdominal hysterectomy performed by the defendant upon the plaintiff, was the result of either a lack of the requisite skill or a negligent failure to exercise that skill.

The plaintiff called the defendant, Dr. Cotton, a specialist in obstetrics and gynecology, as her witness and relied upon that testimony, plus her own, to establish a prima facie case of liability. Dr. Malashock, a urologist who performed remedial surgery, also was called and testified. He, however, was not called upon to give any opinion as to the standard of care nor its exercise in this case.

The record discloses the following. The plaintiff was admitted to the hospital on March 9, 1969, and the hysterectomy was performed. She was discharged from the hospital on March 18, 1969. On the following day she called Dr. Cotton to complain of a vaginal discharge. He asked her if the discharge was urine. She said no. Two days later he examined her in his office and indicated his opinion that the discharge was not urine. He prescribed medication which contained a dye which would show up in the urine. On the day following the discharge was determined to be urine. Dr. Cotton then assumed that there must be a hole in the bladder, caused the plaintiff to be hospitalized and, with her consent, referred her to Dr. Malashock. After confirming Dr. Cotton's tentative diagnosis, Dr. Malashock decided that an attempt should be made to close the hole by a medical procedure called fulguration, which did not involve

opening the abdomen. This, however, did not succeed. It was then determined that surgery requiring the opening of the abdomen was necessary. It was also decided that it was advisable to postpone that operation until all the inflammatory reaction from the original surgery subsided. In the meantime the discharge continued. On June 9, 1969, Dr. Malashock successfully repaired the fistula by a procedure described as a transvesical suprapubic repair.

Following the plaintiff's hospitalization of March 22, 1969, during which the existence of the fistula was confirmed, Dr. Cotton made the following statement in his hospital discharge summary. " 'Because of the excessive bleeding that resulted, it was necessary to ligate bleeding points; and in the process of tying off these bleeding areas, a suture evidently went into the bladder and has eroded through'." Dr. Cotton acknowledged that Dr. Malashock had independently arrived at a similar conclusion. Dr. Cotton testified: "Q. And that is that a suture involved the bladder wall with subsequent erosion through the mucosa? A. Yes, that was one of our opinions. Q. Well, that's the only one that is in either of those reports, isn't it? A. At that time, yes. . . . Q. 'Eroded through' means, does it not, that the original impingement by the suture got worse after a while and made a hole? A. For various reasons." The foregoing admissions by Dr. Cotton would be sufficient to make a prima facie case that the use of a suture in tying off the bleeding area ultimately resulted in the fistula. However, it does not answer the question whether that result was caused by negligence.

Dr. Cotton testified that, upon opening the plaintiff's abdomen at the original surgery, he found that the bladder had adhered to the uterus, the removal of which latter organ was the purpose of the surgery. He stated that normally a separation of the two organs could be made with the fingers or with the use of a sponge and the fingers, but in this case he had to use scissors. The

operative report prepared by Dr. Cotton contained this statement: "The tissue was extremely brittle and friable and the operation was a little more difficult than we usually encounter." His testimony further indicated that the placement of the ligating sutures on the bladder was a necessary procedure. Dr. Cotton described that necessity in answers on cross-examination as follows: "A. The bleeding comes from primarily—the bladder, now, has been displaced, it's down here (indicating); and so all of these blood vessels and the blood vessels to the uterus and to the bladder are common blood vessels, and so the uterus we are going to remove, so the bleeding isn't any problem here because we have clamped the blood supply coming into it. But the bladder is now down here (indicating), and over the dome of the bladder there are many bleeding points that must be ligated. . . . No, I think you have to make a cleavage plane of your own because a normal cleavage plane of the bladder to the uterus has been completely distorted, and so this has to be removed by sharp dissection. In the process of sharp dissection you don't have the normal layer here, and so you have a large—and by 'large' I would say an area like this (indicating) of denuded tissue with blood vessels running all over the surface of it, and these must be ligated."

To support her contention that the defendant did not in placing the sutures exercise the required degree of skill and care the plaintiff relies upon certain parts of Dr. Cotton's testimony on direct examination. After eliciting from Dr. Cotton statements that he had special skills not possessed by the average doctor and obtaining a general description of the surgical procedure used, plaintiff's counsel drew an affirmative response to the following question: "Q. And when you operate on someone for removal of the uterus, a cervix, and part of the vagina, it is a part of your function to not invade any other organ unnecessarily, is it not?" He then elicited information relative to the doctor's expertise in the

placement of sutures and then brought forth the following: "Q. But, of course, yours has gone to quite a higher degree of skill than that that you can exercise if you wish; isn't that so? A. Yes, sir. Q. And in the process of exercising that skill, your function is, with regard to the tying of bleeding blood vessels, is to tie a piece of string, you might say, around the blood vessel and squeeze it shut; is that correct? A. Yes, sir. Q. That does not involve, though, the piercing of any tissue other than going around the blood vessel, does it? A. *Usually, no.* Q. And with the exercise of reasonable care, you have all your life been doing that successfully, haven't you? A. That's right. Q. You can do that successfully without poking holes in things, can't you? A. Yes, sir. Q. And with regard to the placement of organs, it isn't anything beyond your skill if it is applied properly *to suture organs into place* without invading the places you don't want to be? A. I would certainly attempt not to. Q. And you would succeed in that attempt if you were careful, wouldn't you. A. Yes." (Emphasis supplied.)

The plaintiff testified to an admission made to her by Dr. Cotton that the sutures caused the perforation.

It is the rule that in performing professional services a doctor who is a specialist must use the skill and knowledge ordinarily possessed and used under like circumstances by members of his specialty in good standing in his or similar localities. In the application of this knowledge and skill the doctor must also use reasonable care. See, NJI No. 12.01, and authorities there cited. It is also the rule that whether a specific manner of treatment or exercise of skill by a physician or surgeon demonstrates a lack of skill or knowledge or a failure to exercise reasonable care is a matter that must usually be proved by expert testimony. Winters v. Rance, 125 Neb. 577, 251 N. W. 167; Tady v. Warta, 111 Neb. 521, 196 N. W. 901. One of the exceptions to the requirement of expert testimony is the situation where

the evidence and the circumstances are such that the recognition of the alleged negligence may be presumed to be within the comprehension of laymen. Tady v. Warta, *supra.*

The plaintiff asserts that this is a case which comes within the exceptions. She also claims that the requirements of proof of negligence and causation by expert testimony are not required in cases where healthy parts of the body requiring no treatment are injured during surgery and that under the evidence in this case the jury could infer negligence without the aid of expert opinion.

The plaintiff places reliance upon the following authorities: Tady v. Warta, *supra*; Goodwin v. Hertzberg, 201 F. 2d 204; Tomei v. Henning, 67 Cal. 2d 319, 62 Cal. Rptr. 9, 431 P. 2d 633; Pry v. Jones, 253 Ark. 534, 487 S. W. 2d 606; Higdon v. Carlebach, 348 Mich. 363, 83 N. W. 2d 296; Richardson v. Schlosser, 54 Mich. App. 1, 219 N. W. 2d 790; Stickleman v. Synhorst, 243 Iowa 872, 52 N. W. 2d 504.

In Tady v. Warta, *supra,* this court cites some clear-cut and patently outrageous examples of exceptions to the usual rule such as the removal of a healthy organ instead of the diseased one, the placing of a needle in the patient's eye in the course of stitching a wound in the cheek, and cutting off an ear while excising a tumor from the scalp. In Goodwin v. Hertzberg, *supra,* the recital of the evidence is sketchy, but the appellate court apparently interpreted the record as containing an admission by the defendant doctor that his conduct was negligent. In Tomei v. Henning, *supra,* the surgeon, in the course of performing a hysterectomy, sutured the ureter in two places and as a consequence the patient ultimately lost a kidney. In that case the verdict was supported by expert testimony that the failure of the surgeon to locate and determine the condition of the ureter before closing the abdomen was negligent. The opinion points out that the testimony of the expert need not be in any particular language so long as it affords

reasonable support for the inference that the conduct was negligent. In Pry v. Jones, *supra,* the surgeon severed the ureter in the course of surgery for the removal of an ovary. The hospital record in that case showed that after removal of the ovary the doctor looked for the left ureter and could not find it. He then discovered that it was abnormally placed and that he had severed and ligated it. He called in another doctor to make repairs. The defendant's testimony was that the left ureter was inadvertently damaged. There was in that case no expert testimony save that of the defendant surgeon. The Arkansas court held that none was necessary because the determination of negligence lay within the comprehension of a layman. A dissent points out the various areas related to the abnormality and the surgery about which a layman has no knowledge. In Stickleman v. Synhorst, *supra,* the defendant doctor attempted to inject a substance into the plaintiff's trachea to facilitate X-rays. He missed the trachea on his first attempt and injured the plaintiff's throat and neck. The defendant doctor admitted he had made a "mess" of the plaintiff and told her that he would not charge her for his services. There was no expert testimony and the court held that under the circumstances it was not required. In Richardson v. Schlosser, *supra,* the surgeon lacerated the patient's heart and the patient died. The opinion recites almost none of the evidence and it is not helpful as a precedent. In Goodwin v. Hertzberg, *supra,* the defendant doctor perforated the urethra unintentionally. On the stand he said: " 'I must have made the opening myself in the process of operation. I am only human.' " The court said that under the circumstances expert opinion was not required to make the case a submissible one. In Higdon v. Carlebach, *supra,* a dentist badly cut the patient's tongue while using a separator disk. The recital of the evidence in that case indicates that the factual controversy was whether the patient moved unexpectedly causing

the cutting, or whether the doctor handled the disk badly and this caused the injury. After a jury verdict for the plaintiff there was an appeal on the ground there was an absence of testimony on the standard of care and exercise of the required skill. The court held that such expert opinion was not necessary under the evidence.

As we have already noted, Dr. Cotton's admissions made a prima facie case on the causation issue, but the same is not true of that portion of his testimony upon which the plaintiff relies to obviate the usual necessity for expert testimony on the standard of care and skill and its exercise. The testimony to which we refer is contained in the paragraph of this opinion in which the last quotation from Dr. Cotton's testimony is set forth. All the questions there put were placed by the plaintiff's counsel in the abstract and the answers were given in the abstract, for example: ". . . when you operate on someone . . . it is a part of your function to not invade any other organ unnecessarily, is it not?" And then there is the question about placing the sutures, which is immediately preceded by another question in the abstract: "Q. That does not involve, though, the piercing of any tissue other than going around the blood vessel, does it? A. *Usually no*." (Emphasis supplied.) And, ". . . it isn't anything beyond your skill if it is applied properly *to suture organs into place* without invading the places you don't want to be?" (Emphasis supplied.)

None of these questions and their responses had reference to the particular surgery in question and its special circumstances. These questions were put even before the details of the operation were testified to.

The evidence here shows without dispute that the placement of the sutures on the dome of the bladder was necessary and required. The doctor intended to place them there. He had to. For reasons which we will elaborate later we cannot infer and the jury should not be permitted to infer without the aid of some expert

opinion that the manner of their placement was unskill-ful or negligent. We cannot say that some impinge-ment of the bladder might not sometimes occur even in the exercise of the required skill and care.

Most of the authorities cited by the plaintiff are dis-tinguishable. In Tady v. Warta, *supra,* a steel surgical chisel broke, leaving the point in a bone. The plaintiff claimed the defendant doctor twisted it unnecessarily. The court held that expert testimony was necessary to make a prima facie case. Goodwin v. Hertzberg, *supra,* is not applicable. In the present case we have no ad-mission by Dr. Cotton that his conduct was negligent. Such an admission does not follow from his testimony even by inference. In Tomei v. Henning, *supra,* there was expert testimony of negligence. We would agree that such testimony would not always necessarily have to appear in any special language or form of words. Under the evidence recited in Pry v. Jones, *supra,* we would have decided differently than did that court. In Goodwin v. Hertzberg, *supra,* the doctor made factual admissions which could reasonably be interpreted as admitting a lack of skill and care. In Higdon v. Carle-bach, *supra,* the evidence is subject to the reasonable construction that if the injury occurred as the plaintiff claimed, it was the result of negligence. In that case the defendant doctor merely contended it did not happen in the manner claimed by the plaintiff.

We do not overlook that portion of Dr. Cotton's testi-mony which has been called to our attention and in which he gives an explanation for the hole in the blad-der which essentially eliminates a "suture . . . into the bladder" as the cause of the perforation and attributes it simply to a localized deficiency of blood supply caused by the ligation. This contradicts his entry into the hos-pital record to which we earlier referred. At most this would have raised a question of the defendant's credi-bility which would have been for the jury to decide had the plaintiff been able to make a prima facie case.

Opinion testimony of an expert witness may be either necessary or merely useful to the determination of issues by the trier of fact, either the jury or the judge. The necessity or utility of such testimony arises from the fact that the judicial system is called upon to make determinations which require specialized knowledge in fields in which the trier of fact is ignorant or relatively so. It would seem to follow, as a corollary to the foregoing premise, that when an appellate court is called upon to decide whether in a specific evidentiary context expert opinion testimony is necessary, it is making a judgment about its own ignorance or knowledge concerning the matter involved. An analysis and comparison of the cases cited by the plaintiff with those cited by the defendant indicate rather clearly that the difference in the result in closely comparable evidentiary situations lies almost wholly in the assumptions the appellate courts were willing to make about their own knowledge or lack of it. The assumptions we make about our own ignorance concerning the subject matter involved in this particular litigation is evident. Plaintiff has not persuaded us otherwise.

If precedent is necessary the authorities which support in similar factual and evidentiary situations the position we take are the following: Dazet v. Bass (Miss.), 254 S. 2d 183; Modrzynski v. Lust, 55 Ohio L. Abs. 106, 88 N. E. 2d 76; Perin v. Hayne (Iowa), 210 N. W. 2d 609; Brear v. Sweet, 155 Wash. 474, 284 P. 803; Hart v. Steele (Mo.), 416 S. W. 2d 927, 37 A. L. R. 3d 456; and Tady v. Warta, *supra.*

AFFIRMED.

CLINTON, J., Personal Addendum.

I wish to supplement what I have said in the opinion written by me for the court with the following personal view not approved by the court.

I am not unmindful of the fact that a meritorious case may sometimes fail for lack of expert testimony or opinion and that likewise nonmeritorious cases are some-

times unnecessarily brought for the same reason. The remedy for the problem must necessarily be a legislative one involving cooperation of the medical and legal professions. Testimony by a panel of experts impartially chosen, or some other appropriate method, would seem to be much preferable to the hired expert or fruitless attempts to prove a prima facie case by a defendant's own testimony. I cannot help but believe that the patient, the medical profession, the legal profession, and even perhaps the insurance industry would in the long run be better served by solutions which have long been talked about but never implemented.. Efforts in that direction should perhaps be renewed.